COLLECTORS' GUILD, LTD., Plaintiff,

v.

NUMISMATIC COLLECTORS GUILD,
INC., Defendant.

No. 81 Civ. 6889 (RWS).

United States District Court,
S.D. New York.

Feb. 1, 1983.

Ostrolenk, Faber, Gerb & Soffen, New York City, for plaintiff; Sidney G. Faber, Edward A. Meilman, New York City, of counsel.

Slade, Pellman & Biehl, New York City, for defendant; Frederick R. Biehl, Anthony P. Coles, New York City, of counsel.

## OPINION

SWEET, District Judge.

Collectors' Guild, Ltd. ("Collectors") initiated this action against Numismatic Collectors Guild, Inc. ("Numismatic") for trademark infringement on November 9, 1981. Jurisdiction is based upon 15 U.S.C. §§ 1115–1118, 1121 and 1125(a) and upon 28 U.S.C. §§ 1331, 1332, 1338 and 1391(c). Evidence was presented in a two day bench trial on September 20 and 21 and on November 1 the parties made their final submissions. On this record and upon the following findings of fact and conclusions of law judgment will be entered enjoining Numismatic from the use of a mark containing of the words "Collectors" and "Guild" in combination.

## THE FACTS

### The Parties and the Trademark

Collectors, a Delaware corporation doing business in New York, acquired the registered service trademark "Collectors Guild, Ltd." by assignment on November 3, 1980.[1] Since its registration in 1970, the Trademark has been continuously used by Collectors and its predecessor and is now used with respect to works of art, graphic works of art such as prints, lithographs, sketches and etchings, three-dimensional works of art, including pendants, jewelry, figurines, and others.

Collectors is a mail order service specializing in the distribution of works of art, jewelry, and various objects and is a subsidiary of Collectors Guild International, Inc., which owns companies that manufacture frames for works of art. Approximately half of the Collectors items are framed, and eighty percent of the items are sold for under $100, the average unit sale being $90. The price range for Collectors products ranges as high as $425, down to $25. Twenty percent of Collectors' lithographs sell for over $100. Collectors sells only by way of mail orders and analysis of its sales indi-

---

1. The mark was registered on the Principal Register of the United States Patent and Trade-mark Office, Registration No. 887,278, on March 3, 1970.

cates that its purchasers are urban and suburban, over 35 years of age, with incomes over $35,000. Collectors issues catalogs to particularized customer lists, such as Diners Club credit cardholders, as well as other mailings. In 1981 Collectors gross sales were $7 million, and its advertising expenditures were $2.5 million, including mail order advertising.

Numismatic, a New York corporation doing business here, has engaged since 1977 in the sale of coins and coin-related items using the mark "Numismatic Collectors Guild, Inc." Until 1981 Numismatic was a division of Novel Guild, Inc., which offered direct mail services. Numismatic was incorporated as such in 1981.

Numismatic has had gross sales as set forth below:

| Year | Sales | |
|------|-------|---|
| 1977 | $ 289,000 | |
| 1978 | 666,000 | |
| 1979 | 821,000 | |
| 1980 | 2,500,000 | |
| 1981 | 2,500,000 | |
| 1982 | 3,000,000 | (8½ months) |

The cost of sales were such that Numismatic reported no profits through 1981. Numismatic sells its products by means of advertisements and direct mail.

The Numismatic catalog employs a logo featuring "Collectors Guild, Inc." on one line below the word "Numismatic." "Collectors Guild, Inc." is in a different script than "Numismatic."

Notice of the Alleged Infringement

Max Munn ("Munn"), the current president of Collectors, became involved in 1978 as a director, having previously been involved with corporations that produced frames. He became president late in 1979 shortly after a letter dated November 14, 1979, was written by Collectors' counsel demanding that Numismatic cease conduct alleged to infringe the Trademark. No further action was taken until 1981 when Munn learned of Numismatic's existence as a consequence of the misdelivery to Collectors of envelopes addressed to Numismatic. Letters were sent by Collectors to Numismatic on September 28 and October 5, 1981,

conferences were held in an unsuccessful effort to resolve the dispute, and this action was initiated on November 12, 1981.

Reference was made at the trial to conversations between Numismatic and David Geller ("Geller") subsequent to the first letter of November 1979 at a time when Geller was a shareholder with a substantial interest in Collectors. He had formerly been a director of Collectors and was a space representative, the space in this instance being space for advertising in magazines which he represented. His interest in Collectors was resolved at a subsequent time. Apparently Geller conveyed to Mandell, the chairman of Numismatic, that the notice of infringement could be disregarded. Geller did not testify, nor was his deposition admitted.

Competition and Confusion

Both Collectors and Numismatic sell through direct mail. Each sells a relatively few items that overlap. Both do, however, sell items that could be classified as jewelry. Numismatic offers pendants and medallions and Collectors offers pendants and necklaces. No evidence of direct competition or confusion was presented other than that which has been described.

There are thirteen United States Patent and Trademark Office registrations using the word "collectors" and twenty-seven using the word "guild." Collectors has satisfactorily sought to terminate any confusion which might be engendered by the use of the marks Mountain Hall Collectors Guild, International Collectors Guild, Westport Collectors Guild, and Signature Collectors Guild operated by Montgomery-Ward. No instance of competition between Collectors and any of these enterprises has been adduced.

A catalog issued by Franklin Porcelain was introduced and was represented by Collectors to be evidence of an expansion of the business of the Franklin Mint, which initially sold coins and related items, into Collectors' line of business. The Franklin Porcelain catalog contains items which directly compete with Collectors. Collectors'

assertions with respect to the Franklin Mint have not been denied or rebutted.

## CONCLUSIONS OF LAW

The resolution of this dispute requires that this court perform three inquiries: (1) the right of Collectors to pursue its remedies in view of its delay in prosecution from the fall of 1979 to the fall of 1981; (2) the factors set forth in *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), for assessing likelihood of confusion between different products; and (3) the balance of the equities. *See Lambda Elec. Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 924–25 (S.D.N.Y.1981) and authorities cited therein.

### Laches

■ To prevail on a defense of laches Numismatic "must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980) (quoting *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (2d Cir. 1979)).

■ Collectors' conduct does not constitute laches. Collectors' management had no actual knowledge of Numismatic's activities until 1981 despite the letter from Collectors' counsel, which was negligently overlooked.

Numismatic had no right to rely on any representations which Geller may, or may not, have made, and there is no evidence that Geller communicated any discussions he may have had with Numismatic to Collectors' management. A two-year delay in enforcing rights in the absence of any known direct competition is not such as to constitute an estoppel where Numismatic's conduct was undertaken after the registration of the senior mark.

### Likelihood of Confusion

■ The crucial issue in a trademark infringement is "whether there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question." *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251 at 253 (2d Cir.1982). In the case of products that are not in direct competition, courts employ the factors enumerated in *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), to assess the likelihood of confusion. *Lever Bros. Co. v. American Bakeries Co., supra; Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127 (2d Cir.1982). As Judge Friendly stated in *Polaroid*:

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

287 F.2d at 495. In this case, the balance of these six factors, considered below seriatim, is nearly in equipoise.

#### 1. Strength of the Marks.

■ The Trademark is weak since it is primarily descriptive and suggestive as opposed to arbitrary. There is no evidence of a defined market or a leadership role in the market achieved by Collectors.

#### 2. Similarity of the Marks.

■ The Trademark and Numismatic's mark contain identical words except for the preface of "Numismatic" on the latter's mark. In addition, the words "Collector's Guild, Inc." is set apart from the word "Numismatic" in Numismatic's logo, thereby enhancing the likelihood of confusion. *Cf. McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1133 (2d Cir.1979) (setting in

which mark is used colors impression conveyed by it). The descriptive quality of Collectors' mark, however, detracts from the likelihood of confusion.

### 3. Product Proximity.

As to product proximity, both parties rely on the same method of selling their products. Indeed, given the Franklin Mint prototype, the method of sale may be the source of confusion rather than the products themselves. There is a direct proximity, however, with respect to the jewelry products which constitutes a relatively small percentage of the advertised products of both parties. Given the method of sale, the type of products and the identity of certain items sold, it is entirely possible that the products could be seen by purchasers to emanate from a common source.

### 4. Bridging the Gap.

There is a strong possibility that the gap between the offerings of Collectors and Numismatic can be bridged, given the Franklin Mint experience and the absence of any proof concerning the uniqueness of either parties' products. There is no evidence, however, to indicate that Collectors intends to enter the market for the sale of coins or coin-related items, but there is of course, as already noted, direct competition in certain jewelry items. Although Numismatic might expand its jewelry-type items, Collectors has not testified to any plan to extend into Numismatic's sales area.

### 5. Actual Confusion.

There is but one instance of actual confusion and that on the part of the Postal Service, not a consumer. It is relatively unpersuasive and of little probative value.

### 6. Buyer Sophistication.

The buyers of both Collectors and Numismatic objects are reasonably well educated, middle income consumers, but the products and the means of selling are not such as to alert the buyers to any distinctions between the parties.

### 7. Product Quality.

The Numismatic products are not of such a quality as to debase any good will established by Collectors. The similar articles are close in price range, one necklace of Collectors being offered for $58 while pendants are offered by Numismatic at prices ranging from $20 to $160. Because of the use of the medallion form in rare metal the quality image sought to be portrayed by the Collectors catalog is not debased by the Numismatic offering.

### 8. Good Faith

There is no reason to doubt the good faith of Numismatic, given the difficulty faced by this court in reaching its decision. There is no evidence presented from which an inference can be drawn that Numismatic deliberately set out to capture the good will attached to the Trademark. Numismatic has obviously embarked upon a substantial promotional program which appears to be successful in reducing its losses so that a profit may reasonably be anticipated for 1982. Clearly an advertising and promotion program of $2.5 million will produce substantial good will.

Balancing these factors, I conclude there is some likelihood of confusion principally resulting from the identity of the mode of operation of the two corporations and the identity of their marks, differentiated only by the addition of "Numismatic." The likelihood is not great, however, but just barely preponderant, given the absence of any direct evidence of competition or even evidence of the kind sometimes produced by market studies of one kind or another to demonstrate confusion.

### Balance of the Equities

Having found a likelihood of confusion, the balance of the equities must be considered. *See Lambda Elec. Corp. v. Lambda Technology, Inc., supra,* 515 F.Supp. at 928. In performing this calculation, some of the factors already considered are relevant, i.e., the likelihood of bridging the gap, the quality of Numismatic's product, Num-

ismatic's good faith in adopting its mark, and the extent of Numismatic's goodwill.

■ The balance tips toward Collectors, principally because both Collectors and Numismatic appeal to the same market though the great majority of the products are different. Both seek to sell products to a reasonably sophisticated middle income market that is interested in obtaining an object with intrinsic value, a product which is worthy of collection either as a work of art (Collectors) or as a rare object in itself because of its metallic composition (Numismatic). There is sufficient likelihood of confusion and public damage to warrant injunctive relief, carefully tailored to hopefully meet the competing considerations just set forth. *See Perfect Fit Indus. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980).

Toward that end Numismatic will be enjoined from the use of a mark containing the words "Collectors" and "Guild" in combination.

■ No special damages have been established as a consequence of Numismatic's conduct. It is not of a character to require punitive or general damages and therefore an accounting is not required nor will attorneys' fees be awarded. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167 (2d Cir.1976); *Lambda Elec. Corp. v. Lambda Technology, Inc., supra*, 515 F.Supp. at 931.

The parties are directed to submit judgments on notice within ten (10) days from the date of this opinion.

IT IS SO ORDERED.