**ESSENCE COMMUNICATIONS, INC., Plaintiff,**

v.

**SINGH INDUSTRIES, INC., Singh Corporation, Diamond Essence Company and Celestial Creations, Inc., Defendants.**

**No. 88 Civ. 8345 (RWS).**

United States District Court, S.D. New York.

Dec. 22, 1988.

---

Warshavsky, Hoffman & Cohen, P.C. by Doris K. Shaw, New York City (Stoll, Previto & Hoffman, New York City, of counsel), for plaintiff.

Adams & Wilks by Bruce L. Adams, New York City (Michael J. Siris, New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Essence Communications, Inc. ("ECI") has moved by Order to Show Cause for a preliminary injunction pursuant to Rule 65 Fed.R.Civ.P. restraining defendants Singh Industries, Inc., Singh Corporation, Diamond Essence Company and Celestial Creations, Inc. (collectively "Singh") from using the names "Diamond Essence Company," "Diamond Essence," "Ruby Essence," "Sapphire Essence," "Emerald Essence" or "Diamond Essence Retail Gallery," claiming that such use infringes upon ECI's trademarks. Upon the findings and conclusions set forth below, the motion for a preliminary injunction is denied.

Prior Proceedings

This action was filed on the date that the Order to Show Cause was obtained, November 23, 1988. The motion for injunctive relief was heard on affidavits on December 9, 1988. No hearing was requested. The facts set forth below are uncontested except as noted.

*Facts*

ECI is a Delaware corporation with its principal place of business in New York. It is the 20th largest Black owned company in the United States, and the publisher of ESSENCE Magazine, the leading magazine for Black women in this country. ESSENCE Magazine has a total readership of over 3 million people per month, with monthly paid circulation at 850,000. Thirty-three percent of Black women between the ages of 18 and 54 are regular readers of ESSENCE Magazine.

ECI is also in the mail-order catalog business. Beginning in 1972, ECI sold mail order posters advertised in ESSENCE Magazine. In 1980, ECI, through its wholly owned subsidiary Essence Direct Mail Marketing Corp. ("EDMM") issued a mail order catalog called ESSENCE STYLE. In 1984, EDMM and Hanover House, a leading mail order company, formed a partnership for the purpose of producing a mail order catalog, ESSENCE BY MAIL. The catalog features clothing, fashion accessories, and jewelry, and like ESSENCE magazine, is aimed exclusively at Black women. Among its many products, ESSENCE BY MAIL has offered synthetic diamond (cubic zirconium) jewelry.

ESSENCE BY MAIL catalogs are distributed at least eight times a year. In 1987, 6 million catalogs were distributed, and by the end of 1988, 6.4 million. Revenues from the catalog were $4,888,127 in 1987.

In 1987, ECI acquired the rights of Victoria Creations, Inc. ("Victoria") for the mark ESSENCE for jewelry.[1] On October 11,

---

**1.** In 1985, ECI opposed Victoria's application for a registration of the mark ESSENCE for jewelry in the United States Patent and Trademark Office. This was settled in 1987 when Victoria assigned its application to ECI.

1988, the Trademark Registration for ESSENCE for jewelry was issued to ECI as assignee of Victoria. Although ECI did not have a registered trademark for ESSENCE for jewelry until 1988, ECI contends that its rights to the mark ESSENCE for jewelry developed from the first issue of ESSENCE Magazine which featured jewelry, among other fashion accessories. Further, ESSENCE BY MAIL has offered jewelry items for sale from its first issue.

In addition to its magazine and mail order catalog, ECI has produced a nationally syndicated weekly television program, also entitled ESSENCE. Further, ECI licenses the trademark ESSENCE to a variety of products. For example, from May 1983 until February 1988, ECI licensed the name to Wundies, Inc. for the manufacture and sale of intimate apparel for Black women. In 1985, approximately $1 million worth of panties were sold under the ESSENCE trademark. Since 1986, the name ESSENCE has been licensed for sportswear. In 1988, the ESSENCE mark was licensed to Butterick Company, Inc. for home sewing patterns, and to D & S Optical for eyeglass frames.

ECI has spent large amounts of money on advertising its mark. In addition, it actively opposes before the trademark Trial and Appeal Board registration of trademarks which it believes would damage the trademark ESSENCE.[2]

Singh Industries, Inc. and Singh Corporation are the same entity. Singh is a manufacturer and seller of artificial gem stones, primarily simulated diamonds (cubic zirconia). Diamond Essence Company is a division of Singh. Celestial Creations, Inc. is a wholly-owned subsidiary of Singh.

In 1984, Singh began selling jewelry made from its cut stones under the name CULTURE–DIAMOND. In 1986, Singh turned to marketing through mail order catalogs. Two test catalogs, entitled CULTURE DIAMOND and ROYAL DIA-

MOND, were distributed. Also in 1986, Singh entered into an agreement to supply simulated diamond jewelry to Bloomingdale's. Bloomingdale's requested that Singh adopt a new trademark, and Singh selected, with the approval of Bloomingdale's, the trademark DIAMOND ESSENCE. According to Ranjit Singh, President of defendant corporations, the name DIAMOND ESSENCE was selected "because it best suggests the key attribute of Singh's diamond simulants—that they capture the essence of a mined diamond." To this end, the cover of the DIAMOND ESSENCE catalog conveys this "essence of diamond" theme.

Bloomingdale's conducted a mail order test of DIAMOND ESSENCE jewelry which was very successful. Thereafter, as part of its promotion with Bloomingdale's, Singh paid an estimated $81,000 for creating, printing and partial mailing of approximately 600,000 DIAMOND ESSENCE brochures for use by Bloomingdale's in national mailings to customers. In connection with the promotion, Bloomingdale's displayed the DIAMOND ESSENCE jewelry at some of its stores. Singh sold $225,000 of the jewelry to Bloomingdale's.

Partly in response to the success of Bloomingdale's test, Singh expanded its promotional efforts for DIAMOND ESSENCE jewelry. Three editions of the DIAMOND ESSENCE mail order catalogs were printed and mailed in 1987 and four, so far, in 1988. In total, over four million DIAMOND ESSENCE catalogs have been mailed at a cost of over $2 million. Moreover, in 1987 and 1988, Singh placed ads for DIAMOND ESSENCE jewelry in newspapers nationwide with a combined circulation of nearly nine million. The jewelry has also been advertised in *Harpers Bazaar* magazine and *Avenue* magazine, as well as in the B.N. Genius catalogs. "Catalog requests," advertisements requesting the DIAMOND ESSENCE catalog, have

---

**2.** ECI has successfully litigated against the use of "Essence of Beauty" for cosmetics and a beauty salon, "Essence Enterprises" for a modeling finishing agency and beauty center, and "Essence Fashions" for a clothing store. Recently, the district court for the Western District of North Carolina enjoined Ithaca Industry, Inc.'s manufacture and sale of "Sheer Essence" pantyhose as an infringement of ECI's ESSENCE marks. Other cases have ended in settlements whereby the other party agreed to stop using the Essence name.

appeared in national magazines with a combined circulation of over 47 million.

In addition to the mail order business, Singh through Celestial Creations, Inc. on December 10, 1988, opened a retail store on Madison Avenue in Manhattan called "Diamond Essence Retail Gallery." In connection with the store, defendants have spent $336,918 for lease payments, construction, advertising and general expenses. Lease liability is over $1 million. All printed materials connected with the store include the name DIAMOND ESSENCE.

On August 13, 1986, Singh filed an application with the United States Patent and Trademark Office to register the name DIAMOND ESSENCE. The examiner made a preliminary finding that the application was confusingly similar to Victoria's application for the mark ESSENCE for Jewelry. Despite this, Singh continued to use the name DIAMOND ESSENCE. In 1987, an attorney for ECI became aware of the use of the name DIAMOND ESSENCE to sell simulated diamonds. In February, 1988, ECI wrote to defendant protesting the use of the name, but received no response. A second letter was written on March 11, 1988. On June 30, 1988, ECI commenced an action for trademark infringement against Singh. In October of 1988, ECI learned during discovery that a retail store called Diamond Essence Retail Gallery would be opening on Madison Avenue in Manhattan. Thus, ECI brought this motion for injunctive relief.

*Preliminary Injunction*

In order to obtain a preliminary injunction, the moving party must establish:

(a) irreparable harm and (b) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Because ECI has failed to show either irreparable harm or a likelihood of success on the merits, no preliminary injunction will be granted.

*Likelihood of Success: Trademark Infringement under the Lanham Trademark Act and the Unfair Competition Claim*

ECI contends that Singh has infringed ECI's registered trademarks in violation of § 32(1) of the Lanham Act and New York's Unfair Competition Act.[3] The pivotal issue in a trademark infringement case such as this is whether there is a likelihood of confusion concerning the source of the DIAMOND ESSENCE jewelry. *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1248 (S.D.N.Y. 1987). *See also Mobil Oil Corp. v. Pagasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir.1987) (*citing Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (*per curiam*), *cert. denied* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

*Protectability of the Mark*

The Second Circuit has designated four classes of trademarks. "Arrayed in ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). ECI claims that its trademark ESSENCE is an arbitrary mark, for it is "an otherwise common word ... used in an unfamiliar way." *Lever Brothers, Co. v. American Bakeries Co.*, 693 F.2d 251, 253 (2d Cir. 1982). Arbitrary marks are clearly protected. However, rather than being arbitrary,

---

**3.** Section 32(1) of the Lanham Act provides, in part:

"Any person who shall, without the consent of the registrant—

    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant...." 15 U.S.C. § 1114(1).

ESSENCE is a suggestive mark, or a mark which requires " 'imagination, thought and perception to reach a conclusion as to the nature of the goods.' " *Habitat Design Holdings Ltd. v. Habitat, Inc.*, 436 F.Supp. 327, 331 n. 5 (S.D.N.Y.1977), *aff'd*, 573 F.2d 1290 (2d Cir.1978) (*quoting Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968)). Indeed, the District Court for the Western District of North Carolina found that ECI chose the name ESSENCE "because it suggested an inner quality or inner force of black women." Thus, ESSENCE is a suggestive mark and as such is entitled to trademark protection. *See Abercrombie & Fitch*, 537 F.2d at 11.

### The Polaroid Factors

The next step in determining whether Singh's use of the name DIAMOND ES-SENCE should be enjoined is to determine whether consumers are likely to be confused as to the source of two products with similar names. As set forth by the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.*, several factors should be considered in this determination, including:

> the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors will be considered in turn.

### Strength of the Mark

■ The strength of a trademark is "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). The test for determining the strength of a mark overlaps with the test for protectability. Thus, the fact that ECI's ESSENCE

mark is deserving of protection goes to the strength of the mark.

In *Ithaca Industries v. Essence Communications, Inc.*, the United States District Court for the Western District of North Carolina recently found "that the trademark ESSENCE is a strong, distinctive and well known name for the magazine published by ECI and is entitled to a high degree of protection in that field." Slip op. at 34, 706 F.Supp. 1195, —— (W.D.N.C.1986). Thus, in the magazine field, ESSENCE is a strong mark. However, the Court in *Ithaca* also noted that beyond the magazine field, the name ESSENCE is less strong due to third party uses and registrations of the word "essence." Although the Court in *Ithaca* found that Ithaca Industries' "Sheer Essence" Pantyhose infringed upon ECI's mark, its decision was based upon the fact that both ECI and Ithaca Industries directed their products specifically to the Black women's market. This, the Court said, increased the likelihood of confusion. In this case, Singh does not target the Black women's market, and thus the risk of confusion diminishes.

A trademark search conducted by defendants turned up pending applications or registrations of marks employing the word "essence" for a variety of products, including cosmetic and toilet preparations, skin care products, hair care products, perfumes, body lotions, and jewelry and precious stones, among others. Many of these products are the types of goods featured in ESSENCE Magazine. The search also revealed many companies doing business with the name Essence. As the Court in *Ithaca* noted, such third-party registration and use dilutes the strength of the trademark. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 (2d Cir.1983); *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d at 256–57; *Vitarroz Corp. v. Borden*, 644 F.2d 960, 968 (2d Cir.1981).

Because of third party usage, and because ECI has offered no evidence that public awareness of the ESSENCE mark exists for jewelry, which constitutes only a very small fraction of the number of items offered in ECI's catalogs, the factor of

strength of mark favors ECI to the extent that it covers magazines; however, it favors Singh to the extent it covers jewelry.

*Similarity of the Marks*

■ The name of defendant's product, DIAMOND ESSENCE, obviously contains the entire ESSENCE trademark prefaced merely by the word "diamond." Similarly, the DIAMOND ESSENCE catalog, the DIAMOND ESSENCE Company, and the DIAMOND ESSENCE Retail Gallery incorporate all of ECI's trademark. Thus, ECI argues, defendants have merely tagged a word descriptive of their product in front of ECI's mark, thus rendering likely confusion as to source of goods. *See Bon Ami Co. v. McKesson & Robbins, Inc.*, 93 F.2d 915, 916, 25 C.C.P.A. 826, (1938); *Girls Club of America, Inc. v. Boys Club of America, Inc.*, 683 F.Supp. 50, 53 (S.D. N.Y), *aff'd mem.* 859 F.2d 148 (2d Cir. 1988). *See also Collectors' Guild, Ltd. v. Numismatic Collectors Guild, Inc.*, 564 F.Supp. 957, 960–961 (S.D.N.Y.1983) ("Numismatic Collectors Guild" likely to cause confusion with "Collectors' Guild"); *American Optical Corp. v. North American Optical Corp.*, 489 F.Supp. 443, 449 (N.D.N.Y 1979) ("American Optical" and "North American Optical" are "virtually identical.").

Nevertheless, the fact that the name "ESSENCE" is included in DIAMOND ESSENCE is not enough to prove that confusion as to source of product will be likely. *See, e.g., Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 218 (2d Cir.1985) (SPORTSCREME vs. BEN GAY SPORTSGEL); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117–18 (2d Cir.1984) (KING KONG vs. DONKEY KONG); *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1007 (PLUS PRODUCTS vs. PLUS); *Clarks of England Inc. v. Glen Shoe Co.*, 485 F.Supp. 375, 378–79 (S.D.N.Y.1980) (TREK vs. STAR TREK). Rather than looking just at the name of a product, the court must look at the overall image of the product, including its packaging. *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208 (2d Cir.1985);

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir.1984).

When the marks are viewed side by side in their entirety, there is no similarity aside from the use of the word "Essence". The ESSENCE BY MAIL Catalog copies the design of ESSENCE Magazine: the word ESSENCE is boldly emblazoned in bright red letters across the top of the catalog, with the words "By Mail" printed inside of the "C." On the top left hand corner appears the statement "the fashion catalog for today's black woman." On the cover is a picture of a Black model. In contrast, DIAMOND ESSENCE catalogs have a solid black border with the words DIAMOND ESSENCE printed in white italics across the top of the cover. The words are separated by a red, white and blue design of a mined diamond. Framed in a white border is a picture of enlarged simulated diamond jewelry or a model wearing the jewelry. Underneath the picture is the caption:

> Inside, a woman's best friend, and a man's best ally: the newest, exclusive collections of jewelry that possess the *essence of diamonds*—the closest yet to a mined diamond, yet at a fraction of its cost. A highly prized possession—or gift! Only available to you through this catalog.

As Singh claims, the name of the catalog suggests that the diamond simulants pictured within capture the essence of mined diamonds. ECI's contention that the word "Essence" is the dominant word in the term DIAMOND ESSENCE is incorrect, for it is the combination of the words that leads to the theme that defendants' product has the essence of a mined diamond.

As for the content of the catalogs, the DIAMOND ESSENCE catalog carries only jewelry, whereas ESSENCE BY MAIL carries a variety of items, only a very small portion of which is jewelry. Further, whereas ECI targets its magazine and catalog exclusively to Black women and uses only Black models, defendants target their DIAMOND ESSENCE jewelry to an affluent market and do not aim at any particular ethnic group. DIAMOND ESSENCE catalogs have never included a Black wom-

an model. Thus, examination of the products reveals little similarity between the two. This factor therefore favors Singh.

*Proximity of the Product and Bridging the Gap*

■ ECI contends that it directly competes with defendants on the grounds that both sell jewelry and both do it by mail order catalog. However, there is no direct competition here. First, the products being sold through the mail order catalogs are different; and second, the products are aimed at different markets.

Although there is a slight price overlap in the products—jewelry prices in the ESSENCE BY MAIL "Holiday '88" catalog range from $12 to $79.95 while prices in a recent DIAMOND ESSENCE catalog range from $15 to over $1,000—the overlap is minimal. ECI's jewelry is moderately priced, with no item over $80, whereas the average price of an item in the DIAMOND ESSENCE catalog is $300. In addition, defendants' jewelry is set in 14 carat gold settings and is packaged in a black velvet jewelry box, whereas ECI's jewelry is packaged in a white cardboard box along with some cotton. Thus, ECI and defendants are selling different products.

The existence of a price difference is not, in itself, enough to eliminate the possibility of competition. *Habitat Design Holdings Ltd. v. Habitat, Inc.*, 436 F.Supp. at 331. However, when one considers the markets to which these products are targeted, the possibility of competition becomes even less likely. According to the Second Circuit, in assessing the proximity of goods, both "the nature of the products themselves and the structure of the relevant market" must be considered. Here, as seen, plaintiffs and target their product exclusively to the Black market. Defendants, however, target their product to the affluent, high priced market. Less than 2% of defendants' customers are Black.

Although ECI and defendants sell different products directed to different markets, ECI claims that a problem is raised by the fact that both companies sell jewelry through mail order catalogs. In *Collectors Guild*, 564 F.Supp. at 961, this court said:

the method of sale may be the source of confusion rather than the products themselves.... Given the method of sale, the type of products and the identity of certain items sold, it is entirely possible that the products could be seen by purchasers to emanate from a common source.

*See also Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1322 (2d Cir.1987). However, *Collectors Guild* is distinguishable. In that case, the Court found that direct competition existed, stating that it was important that both companies appealed to the same market: "[b]oth seek to sell products to a reasonably sophisticated middle income market that is interested in obtaining an object with intrinsic value, a product which is worthy of collection ..." at 962. Here, as seen, the companies target different markets. Moreover, unlike the situation in *Collectors Guild*, where both parties' jewelry sales constituted a small percentage of their advertised products, DIAMOND ESSENCE sells nothing but jewelry.

As for the contention that the companies compete because they have used at least four of the same mailing lists,[4] sharing of mailing lists does not necessarily mean that any individual received both catalogs. Although mailing lists may have been purchased from the same source, the names on the lists are likely to be entirely different, for a source might contain hundreds of thousands of names, and a company purchases only a list of a certain number. Thus, absent a showing of overlap, there is little likelihood that ECI and defendants received the same names. Because their is no proof of direct competition, this factor favors defendants.

Whether the senior user plans to expand into the junior user's product line and "bridge the gap" between differences in the product is a factor relevant to the likelihood of confusion. Here, there is no evidence that ESSENCE intends to move into a higher priced market. Thus, the factor of proximity of product favors defendants.

---

**4.** The four mailing lists in common are Royal Silk, Spiegel, Willow Ridge and Shop At Home.

*Actual Confusion*

■ ECI admits that it has no evidence of actual confusion. Although lack of evidence is not dispositive of the factor of confusion, *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987), the absence of confusion to date "is a strong indicator that the likelihood of confusion is minimal." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1006; *Lever Brothers v. American Bakeries Co.*, 693 F.2d at 257. Similarly, ECI's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d at 117; *Mattel, Inc. v. Azrak–Hamway International, Inc.*, 724 F.2d 357, 361 (2d Cir.1983); *Universal City Studios, Inc. v. T–Shire Gallery, Ltd.*, 634 F.Supp. 1468, 1478 (S.D.N.Y.1986).

Defendants claim that during the two and one-half years in which they have carried the DIAMOND ESSENCE products, they have not encountered a single instance of confusion in the marketplace between their product and ECI's magazine or mail order catalog. In addition, defendants commissioned two telephone surveys in December, 1988: one survey of consumers selected at random from the telephone directories of Manhattan, Morris County New Jersey, and Visalia, California, and one of previous purchasers of defendants' DIAMOND ESSENCE jewelry, also selected at random. The survey questions were prepared with the assistance of a direct-mail marketing expert. Of the 931 persons surveyed, not one connected DIAMOND ESSENCE jewelry with ESSENCE Magazine or the ESSENCE BY MAIL catalog, including 92 interviewees who stated that they were Black. Thus, the factor of factual confusion strongly favors defendants.

*Good Faith*

■ When Singh tried to register DIAMOND ESSENCE with the United States Patent and Trademark Office in August of 1986, the examiner found the "Diamond Essence" "so resembles [Victoria's pending application for ESSENCE for jewelry] as to be likely, as used in connection with the goods ... to cause confusion, or to cause mistake, or to deceive." Still defendants did not stop using the name "Diamond Essence. Because defendants knew that there was a problem with the mark DIAMOND ESSENCE, ECI contends that they have exhibited lack of good faith in their continued use of the name.

However, defendants' knowledge of a potential problem with the patent does not necessarily connote bad faith. *McGregor*, 599 F.2d 1126, 1137 (2d Cir.1979); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978) (*per curiam*, *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Rather than choosing DIAMOND ESSENCE in order to profit from ECI's product and name recognition, Singh chose the name DIAMOND ESSENCE because it suggested that their simulated diamond product captures the essence of a mined diamond. Indeed, this is the theme of the defendants' catalog and the promotional materials.

In addition, at the time of defendants' trademark search, no registered marks were found; Victoria's application for registration of DIAMOND ESSENCE had not yet issued. Thus, defendants commenced use of the DIAMOND ESSENCE mark and filed an application for registration at the Patent and Trademark Office in August, 1986. Furthermore, the letter from the Trademark Examiner did not *refuse* registration to defendants, but made a preliminary indication that the marks were confusingly similar. Because defendants believed then and still believe now that the commercial impression of the name DIAMOND ESSENCE is different from the word ESSENCE used on its own, they anticipate that their mark might still be registered, notwithstanding the registration of ESSENCE.[5] Furthermore, defendants never

---

5. Even if registration of the name DIAMOND ESSENCE had been refused to defendants, that would not end the case. In *Vitarroz Corp. v. Borden, Inc.*, the patent office refused Borden's

heard of ECI's protest until they received a letter from ECI's attorney in February, 1988. The issue of good faith thus weighs in favor of defendants.

*Quality of the Product and Sophistication of the Buyers*

The *Polaroid* factor of quality is pertinent primarily to protect the prior user from the "risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1202 (S.D.N.Y. 1979), *aff'd mem.* 636 F.2d 1203 (2d Cir. 1980). Because defendants' products are of high quality, this factor diminishes in importance.

As for the factor of sophistication of buyers, this factor results in a draw. As plaintiffs point out, it is hard to be a "sophisticated" consumer when buying out of a catalog. Consumers of mail order products tend to rely upon the reputation of the catalog vendor. Here, there is no evidence that people who order jewelry from ESSENCE BY MAIL are more or less sophisticated than those who order from DIAMOND ESSENCE.

*Expert Opinion*

This is not a traditional *Polaroid* factor, but ECI urges the court to consider the affidavit of Katie Muldoon ("Muldoon"), an expert in the direct mail marketing field, who states that consumers are likely to be confused by the similar names of ECI and defendants' products and the fact that both offer artificial diamond jewelry. Moreover, Muldoon states that the name "diamond essence" will cause a consumer to identify the catalog with ESSENCE MAGAZINE.

Singh also offers expert witness testimony. They submit affidavits by Alfred M. Schmidt, Jr. and Alan Meckler, experts in the direct mail marketing field, to show that there is no likelihood of confusion. Because both parties have offered expert opinions in support of their positions, this factor ends in a draw.

*Balance of Factors*

The balance of *Polaroid* tips unmistakably in favor of defendants. The ESSENCE mark is strong in the magazine field, but not in jewelry; the marks, when examined in their entirety, are not similar; there is no evidence of direct competition between the products; there is no evidence of actual confusion as to the source of defendants' products; and defendants chose their name in good faith. Thus, ECI has failed to show a likelihood of success on the merits on its Lanham act claim.

As for ECI's unfair competition claim, "proof of likelihood of confusion as to source is essential to prevail" on this cause of action. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir. 1983). Because such proof has not been established, ECI has failed to show a likelihood of success on this claim.

*Section 368-d: The Anti-Dilution Statute*

Plaintiffs also make a claim based upon the New York "anti-dilution" statute, N.Y. Gen. Bus. Law § 368-d, which states:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Although the anti-dilution statute is broader than the trademark law, *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y. S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977), there is no evidence that DIAMOND ESSENCE is "feed[ing] upon the business reputation of an established distinctive trade-mark or name," which is what the statute was intended to prevent. *Allied,* 42 N.Y.2d at 544, 399 N.Y.S.2d at 632, 369 N.E.2d at 1166. For one thing, ECI's trademark in ESSENCE is not "truly dis-

---

attempt to register the mark BRAVOS for tortilla chips, citing plaintiff's prior registration of the same mark for crackers. The Second Circuit gave no weight to this. Instead, it looked at the *Polaroid* factors and found no likelihood of confusion. 644 F.2d 960 (2d Cir.1981).

tinctive" in the jewelry field. Therefore, ECI has failed to establish a likelihood of success on the merits on the issue of whether defendants have violated the New York anti-dilution statute.

Further, for a successful claim under § 368–d, there must be a likelihood of dilution, which is characterized as a "whittling down" of the identity or reputation of a trademark. *Id.*, citing *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y.1972). Here, there is no evidence of such whittling down. Thus, again, ECI has not shown a likelihood of success on the merits. Finally, "the absence of predatory intent by the junior user is a relevant factor in assessing a claim under the anti-dilution statute." *Sally Gee*, 699 F.2d at 626. It has been established that defendants' use of the term DIAMOND ESSENCE was made in good faith, and not with "predatory intent."

*Irreparable Harm*

Even if ECI had proven a likelihood of success on the merits, which it did not, it would still have to prove that it would suffer irreparable harm if defendants are not enjoined. In order to show irreparable harm, ECI need only to show a likelihood of confusion as to source or sponsorship of producers. *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d at 1314. However, there has been no such showing. There has been simultaneous marketing by ECI and DIAMOND ESSENCE for over two years, and there is not one known instance of confusion, despite the wide national exposure of DIAMOND ESSENCE jewelry. Thus, ECI has not established that it will suffer irreparable harm. Indeed, ECI has not shown that it has lost any lost sales as a result of defendants sale of DIAMOND ESSENCE.

Defendants, on the other hand, would be irreparably harmed by an injunction. They have spent nearly $3 million on advertising DIAMOND ESSENCE in order to establish goodwill and a reputation under the DIAMOND ESSENCE name. Over $2 million has been spent in disseminating the DIAMOND ESSENCE mail order catalogs, and $540,000 has been committed for the De-cember, 1988 edition. Further, there are orders booked for over $500,000. On top of this, $336,918 has been spent in preparation for the opening of the Diamond Essence Retail Gallery Store on Madison Avenue. An injunction would cause all of this to be lost, and would put defendants out of the retail business until packaging, boxes, catalogs and invoices could be obtained.

*Conclusion*

For the reasons set forth above, ECI's motion for a preliminary injunction is denied.

It is so ordered.